400 P.2d 349

Bill P. HATCH, D.O., Geoffrey Lawrence, D. O., James Chapman, D.O., D. A. Stiles, D. O., L. A. Nowlin, D.O., H. C. Purtzer, D.O., and C. H. Crotty, D.O., Appellants,

v.

Claude EMERY, Ivan J. Mashek, Nelson F. Huie, James R. Merritt, Dick Smith, Allan R. Perry, L. A. Tanner, Robert P. Van Denburgh, and Edward Mathis, Appellees.*

I CA–CIV 35.

Court of Appeals of Arizona.

March 26, 1965.

Rehearing Denied May 4, 1965.

Review Denied June 2, 1965.

---

* This appeal was filed with the Arizona Supreme Court and assigned that Court's Number 7650. The matter was referred to this Court pursuant to Section 12–120.23, A.R.S.

Cox & Hedberg, by James J. Cox, Jr., Phoenix, for appellants.

Carl W. Divelbiss, Phoenix, for appellees.

CAMERON, Judge.

This is an appeal from an order of the court below, dismissing plaintiff-appellant's petition for Writ of Mandamus. In January of 1952, articles of incorporation creating Phoenix General Hospital, as a non-profit corporation, were filed and approved by the Arizona Corporation Commission. The membership of the corporation at that time was composed solely of members of the osteopathic profession. In 1955, the membership was expanded to include a board of directors or trustees, composed of lay members. The term "Director" or "Trustee" being interchangeable in this opinion. As a result, in September of 1959, the membership of the corporation consisted of sixty members who were osteopathic doctors and members of the active staff, and ten lay members who composed the board of directors of Phoenix General Hospital, Inc. In the interim, a tract of land was purchased, and a hospital was constructed at the corner of 19th Avenue and Indian School Road in Phoenix, Arizona. This hospital was open for use in the month of December, 1958, and is still in operation.

The lay members of the corporation served only on the board of directors, and were not members of the active staff of the hospital. On or about 13 September, 1959, some of the members of the active staff who were also members of the corporation, requested that the secretary of the corporation call a membership meeting

to be held in the evening of 29 September, 1959, to amend the articles of incorporation.

At this time, the provisions for membership in this corporation, as set out in Article 13 of the by-laws as amended in 1955, read as follows:

"Members of the Corporation, as herein used, shall include any and all members of the Active Staff in addition to such other persons as may be approved by the Board of Trustees upon recommendation of any member or members of the Active Staff and of the Board of Trustees. Any person other than a member of the Active Staff admitted to membership shall be issued a certificate of membership upon such terms and conditions as may be established by the board of trustees."

The board of directors or trustees met at noon on 29 September, 1959, and pursuant to this by-law and upon the recommendation of three members of the active staff, approved and issued certificates of membership in the corporation to one hundred and fifty-nine people consisting of friends, relatives and associates of the members of the board of directors or trustees. During the afternoon of 29 September, 1959, proxies were obtained from the one hundred and fifty-nine people who had been admitted to membership at the noon meeting. The proxies were signed and given to one individual. At the evening meeting, the amendment to the articles of incorporation proposed by members of the active staff was defeated by a vote of one hundred and seventy-four to thirty-five. Thirty-five members of the active staff voted for the amendment, while fifteen members of the corporation, including the ten lay directors, voted against the amendment, together with the one hundred and fifty-nine proxies.

Thereupon, a member of the board of directors moved that the following resolution be adopted:

"RESOLVED, that the Articles of Incorporation of this corporation be amended by adding two additional paragraphs to Article VIII of the Articles of Incorporation, as follows:

" 'These Articles of Incorporation may be amended by a two-thirds (⅔) majority vote of all the members of the Board of Trustees at any regular or special meeting of such Board, of which each Board Member shall have had at least three (3) days written notice of said meeting, said notice setting forth the proposed alteration, amendment or repeal; provided, however, that no such notice need be given to any member of the Board of Trustees who shall in writing waive the same.

" 'The Board of Trustees shall have the sole and exclusive power to adopt, amend and rescind By-laws; to fill vacancies occurring in the Board of Trustees, whether caused by resignation, death or otherwise.' "

Again the vote was one hundred seventy-four to thirty-five, this time in favor of the substitute amendment. The amendment thus passed and was filed with the Corporation Commission on 1 October, 1959. The plaintiffs, members of the active staff as well as members of the corporation, bring this action to set aside the amendment as allegedly passed and to recognize and substitute the one allegedly defeated.

The lower court held for the defendants, and plaintiffs, after many motions and procedural matters, bring this appeal from the decision of the lower court, quashing the Writ of Mandamus.

■ Both the by-laws and the articles of incorporation are silent concerning the use of proxies. The evidence is sufficient to indicate that proxies had been used in the past and therefore could be adopted by custom. Rossing v. State Bank, 181 Iowa 1013, 165 N.W. 254 (1917); In re Tidewater Coal Exchange, 2 Cir., 280 F. 638 at 643 (1922).

There is no evidence that the new members, admitted at the noon meeting on 29

September, 1959, did anything other than sign proxies for the use and benefit of the board of directors or trustees. There is no evidence to indicate that any of the new members of the corporation attended the meeting on the evening of 29 September, and the evidence indicates that the only reason for their membership was to provide proxies to be voted at that meeting for and on behalf of the board of directors or trustees. Other than signing the proxies they undertook no responsibilities in membership and had nothing to do with said hospital after signing said proxies.

■ The Arizona Revised Statutes, under "Mandamus", states as follows:

"A writ of mandamus may be issued by the supreme or superior court to any person, inferior tribunal, corporation or board, though the governor or other state officer is a member thereof, on the verified complaint of the party beneficially interested, to compel, when there is not a plain, adequate and speedy remedy at law, performance of an act which the law specially imposes as a duty resulting from an office, trust or station, or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled and from which he is unlawfully precluded by such inferior tribunal, corporation, board or person." Section 12–2021, Arizona Revised Statutes.

The evidence shows that Phoenix General Hospital was the only osteopathic hospital in the Phoenix area, and that the plaintiffs below, all members of the active staff and all osteopathic doctors, certainly had an interest in the operation of said hospital. It is clear also that plaintiffs below have no plain, adequate and speedy remedy at law, outside of an extraordinary writ such as mandamus.

The Arizona Revised Statutes discuss the powers of a non-profit corporation as follows:

"A corporation organized for purposes other than profit may in its by-laws, constitution or articles of incorporation provide for: (1) The qualification of members. (2) The manner of election and terms of admission to membership, but *members admitted after incorporation shall have equal rights and be subject to equal responsibilities.* * * *" (Emphasis added.) § 10–453, A.R.S.

The evidence is clear that when the membership was expanded in 1955 to include lay members of the corporation, said lay members to be members of the board of directors or trustees, that these new members had rights and responsibilities equal to those of the previous members of the corporation who were also staff members. By equal responsibilities we do not mean the same responsibilities, but at least responsibilities of similar magnitude. The lay members of the board had the responsibility of the management of the corporation, and their responsibilities were at least equal to that of the active staff members.

The one hundred and fifty-nine members who were admitted to membership, after giving their proxies to one person, assumed no responsibilities in the operation or conduct of this corporation. The sole purpose for their election to membership was to enable the board of directors or trustees to thwart the will of the majority of the members of the corporation, and when their proxies were voted that evening, for the substitute amendment to the articles of incorporation, they lost all power or influence over the future course of the corporation. The amendment gave the power to amend the articles to a two-thirds (⅔) majority vote of the members of the board of trustees, and gave them the power to replace any member of that board. The amendment put the board of trustees in absolute control of the corporation with no obligation to answer to the membership for any future amendments in the

articles of incorporation or changes in personnel of the board.

It is admitted that under our law, a corporation has incidental power to admit new members, and in the absence of charter or statutory restrictions the matter is left wholly to its determination. Porterfield v. Black Bill and Doney Parks Water Users' Association, 69 Ariz. 110, 210 P.2d 335 (1949), but the directors or trustees of a corporation whether it be for profit or non-profit are in a fiduciary relationship with the stockholders or members of that corporation, and there is a duty of fair dealing with that membership. As has been stated:

> "A director of a corporation occupies a fiduciary relation to it and its stockholders. His position is one of trust and he is frequently denominated a trustee and so held accountable in equity. The ordinary trust relationship of directors of a corporation and stockholders is not a matter of statutory or technical law. It springs from the fact that directors have the control and guidance of the corporate business affairs and property and hence of the property interests of the stockholders. Equity recognizes that stockholders are the proprietors of the corporate interest and are ultimately the only beneficiaries thereof. Those interests are in virtue of the law entrusted through the corporation to the directors and from that condition arises the trusteeship of the directors with the concomitant fiduciary relationship." Ashman v. Miller, 6 Cir., 101 F.2d 85, at 90–91, (1939).

And also:

> "The individual defendants who were directors of the corporation were acting in a fiduciary capacity and were required to exercise their authority in the utmost good faith. (Citations omitted.) They could not 'rightly manipulate the affairs of the corporation primarily with the design of securing the control of the corporation to one particular group of stockholders, or of excluding another group from the exercise of its corporate rights' (citation omitted)." L. E. Fosgate v. Boston Market Terminal Co., 275 Mass. 99, 175 N.E. 86 at 90 (1931).

We do not wish to infer that the motives of the board of directors in the instant case were anything less than well-meaning and well-intentioned, nor do we wish to infer that in attempting to gain control of this corporation they were illegally or immorally motivated. We do say, however, that in creating one hundred and fifty-nine new members of the corporation, whose sole purpose was to vest control of this corporation in the hands of a minority of the members, directly contrary to the wishes of a majority of the membership, said one hundred and fifty-nine new members being created on the eve of the meeting, and said one hundred and fifty-nine members having no connection, interest or responsibility in and to the affairs of said corporation, either then or now, the board of directors acted contrary to their fiduciary obligation to the membership of that corporation.

Notwithstanding the lack of improper motives on the part of the board, it is particularly offensive to our sense of fair-play and a breach of the board's fiduciary obligation to the membership, that the one hundred and fifty-nine members were created and their proxies obtained only a few hours before the membership meeting of 29 September. This gave the staff members no opportunity to obtain proxies of their own from "new" members, to explain the position of the majority of the active staff to the "new" members or to resort to the courts for relief before the said meeting.

For that reason, the decision of the lower court is hereby reversed, with instructions that the Amended Alternative Writ be made peremptory.

STEVENS, C. J., and DONOFRIO, J., concur.